STATE of Arkansas *v.* Jaye M. BROWN
and Michael C. Williams

CR 03-914 156 S.W.3d 722

Supreme Court of Arkansas
Opinion delivered March 25, 2004

[Rehearing denied May 6, 2004.]

*Mike Beebe*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellant.

*Dale W. Finley*, for appellee.

Robert L. Brown, Justice. The State of Arkansas appeals an order suppressing contraband seized from the home of appellees Jaye Brown and Michael Williams. The State raises two points on appeal: (1) that the circuit court erred in holding that Article 2, § 15, of the Arkansas Constitution requires that advice of the right to refuse consent be given by law enforcement officers before a consensual search may be found to be voluntary; and (2) that the circuit court erred by holding under the same constitutional provision that police officers must disclose all information known to them before a consensual search may be found to be voluntary. We hold that the circuit court correctly concluded that a home dweller must be advised of his or her right to refuse consent in order to validate a consensual search under the Arkansas Constitution. For that reason, we affirm.

The facts are that on August 23, 2002, at about ten o'clock in the morning, three agents of the Fifth Judicial District Drug Task Force (Chris Ridenhour, Johnny Casto, and Shawn Armstrong) approached the residence of appellees Brown and Williams in Russellville. They did so because of information received from two anonymous sources that Brown and Williams were involved in drug activity and that a small child inside the trailer had become ill due to drug manufacturing. Upon reaching the door to the trailer home, they smelled a strong and familiar chemical odor. Agent Ridenhour knocked on the door, and Brown answered. The agent told her that the three agents had information that someone was possibly growing marijuana there or there was other illegal drug use at the residence and that they wanted to investigate.

Brown asked the agents to wait a minute. She closed the door but then returned a short while later. Agent Ridenhour presented her with a consent-to-search form to sign which read:

## CONSENT TO SEARCH

I give permission to the 5th Judicial District Drug Task Force to search my vehicle/residence (circle one) for contraband or illegal items.

_____
Person giving consent

_____
Officer:

_____
Date and Time

Jaye Brown and Officer Ridenhour signed the consent form. Jaye Brown did not circle "vehicle" or "residence." A search of the residence by the agents ensued.

At that point, appellee Michael Williams, who apparently had been asleep, emerged from the bedroom. There was also a child present in the trailer home. Agent Armstrong observed evidence of methamphetamine use. Agent Ridenhour looked in the bedroom and saw evidence of precursors used to manufacture methamphetamine. Brown and Williams were arrested, and Agent Ridenhour subsequently sought and received a search warrant to search the residence and seize any evidence or contraband found.

The search warrant was executed, and evidence of methamphetamine manufacture and usage as well as marijuana growth and possession was seized. Brown signed a statement that same day which said that Williams was manufacturing methamphetamine and that she told him to stop. Williams also signed a statement and admitted to the manufacture and use of methamphetamine. He said in his statement that he had been living with Brown for about four years. Brown and Williams were later charged with manufacture of methamphetamine and marijuana and possession of methamphetamine with intent to deliver.

Brown and Williams filed separate motions to suppress the evidence seized, because, they contended, it was seized as part of an illegal search. Williams specifically raised the issue of an invalid search under Article 2, § 15, of the Arkansas Constitution. A hearing ensued before the circuit court. Brown testified at the hearing that she was told that the agents wanted permission to search for marijuana. She said she signed the consent form because she thought she had to do so. She testified: "Thought I had no choice but to sign it." She added that she did not know that she could say "no" and not sign it. Williams also testified that the agents announced that they were searching for marijuana.

Agent Ridenhour testified at the hearing that the agents did not tell Brown that she was not required to sign the consent form. Agent Armstrong testified that it was not Drug Task Force policy to advise occupants that they did not have to consent to a search. Agent Ridenhour testified that he told Brown that the search would be for marijuana and "other illegal use of drugs." He admitted, however, that methamphetamine was not mentioned. He testified that he did not advise her that she could refuse to sign the form.

On June 13, 2003, the circuit court issued a letter opinion, which read:

> The facts of this case represent the concerns the Arkansas Supreme Court Justices had in the recent case of Griffin v. State, 347 Ark. 788, 67 S.W.3d 582.
>
> In the present case Officer Ridenhour testified about a phone call advising him of a child at defendants' residence being sick because of drugs. The drug task force went to the mobile home residence. Officer Ridenhour talked with defendant Brown and told her he had information that there was marijuana in the residence or that it

was being grown there. There was no mention of a child being sick because of drugs. The officers obtained a written consent from defendant Brown and entered the residence.

It is undisputed the officers did not have probable cause for a search warrant at the time a consent to search was obtained.

The "knock and talk" procedure used in this case is simply a way to avoid the burden placed on law enforcement officers in obtaining a search warrant.

It would appear that if deception were used in stating the purpose of a requested search then a consent obtained would not be an informed and valid consent.

This Court feels that a "knock and talk" policy of police officers can survive a constitutional challenge only if the right to refuse consent is in writing or is explained before consent is obtained.

Based upon the above factors, this Court feels that the consent to search obtained in this case was not valid; therefore, the motions to suppress filed by both defendants should be granted.

An order was entered that same day granting the two motions to suppress.

## I. Jurisdiction

■ We first address whether this court has jurisdiction to hear this State appeal pursuant to Arkansas Rule of Appellate Procedure—Criminal 3. The State contends that we do because the appeal implicates Article 2, § 15, of the Arkansas Constitution and whether that section of our state constitution requires that a home dweller be advised of the right to refuse a consent to search prior to a consent being given. We agree with the State that this appeal raises a significant search-and-seizure issue involving the procedure known as "knock and talk." Accordingly, it is a matter which concerns the correct and uniform administration of the criminal law which requires review by this court. *See* Ark. R. App. P.—Crim. 3(c). *See also State v. Pruitt*, 347 Ark. 355, 64 S.W.3d 255 (2002). This court has jurisdiction to review the matter.

## II. Consensual Search

The State raises two issues relating to a consensual search. It first contends that the Arkansas Constitution does not require that police officers must advise home dwellers that they have the right

to refuse consent to search. Secondly, the State claims that our state constitution does not require police officers to disclose all information known to them before a consensual search may take place. According to the State, the circuit judge in the case at hand decided to suppress the evidence seized for both reasons. Because we conclude that the circuit judge correctly construed the Arkansas Constitution to require law enforcement officers to advise home dwellers of their right to refuse to consent to a search, we need not address the second point raised by the State.

This case presents the second opportunity for this court to consider whether the police procedure known as "knock and talk" is constitutionally permissible under Arkansas Constitution Article 2, Section 15, in the past two years. In *Griffin v. State*, 347 Ark. 788, 67 S.W.3d 582 (2002), a constitutional attack was mounted against the procedure under our state constitution. We decided that case, however, on the ground that police officers had begun an illegal search of the defendant's car and shed *before* they approached the defendant's front door to ask for consent to search. Hence, the *Griffin* opinion did not decide the validity of the "knock–and–talk" procedure under our state constitution. Nevertheless, in three concurring opinions, the "knock–and–talk" procedure was called into question under the state constitution by three justices of this court. *See Griffin v. State, supra* (Corbin, J., concurring; Brown, J., concurring; Hannah, J., concurring).

A brief description of the "knock–and–talk" procedure is in order. The procedure has become fashionable as an alternative to obtaining a search warrant when police officers do not have sufficient probable cause to obtain a search warrant. What generally occurs is that several law enforcement officers accost a home dweller on the doorstep of his or her home and request consent to search that home. If an oral consent is given, the search proceeds. What is found by police officers may then form the basis for probable cause to obtain a search warrant and result in the subsequent seizure of contraband. It is the intimidation effect of multiple police officers appearing on a home dweller's doorstep, sometimes in uniform and armed, and requesting consent to search without advising the home dweller of his or her right to refuse consent that presents the constitutional problem.

This court recently discussed the constitutional ramifications of warrantless entries into private homes:

A warrantless entry into a private home is presumptively unreasonable under the Fourth Amendment. *Welsh v. Wisconsin*, 466

U.S. 740 (1984); *Scott v. State*, 347 Ark. 767, 67 S.W.3d 567 (2002); *Butler v. State*, 309 Ark. 211, 829 S.W.2d 412 (1992). However, the presumption of unreasonableness may be overcome if the law-enforcement officer obtained the consent of the homeowner to conduct a warrantless search. *See Holmes v. State*, 347 Ark. 530, 65 S.W.3d 860 (2002) (citing Ark. R. Crim. P. 11.1; *Hillard v. State*, 321 Ark. 39, 900 S.W.2d 167 (1995)). This court has established that the State has a heavy burden to prove by clear and positive testimony that a consent to search was freely and voluntarily given. *Holmes v. State, supra*; *Norris v. State*, 338 Ark. 397, 993 S.W.2d 918 (1999); *Scroggins v. State*, 268 Ark. 261, 595 S.W.2d 219 (1980). A valid consent to search must be voluntary, and "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 40 (1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)). Any consent given must be unequivocal and may not usually be implied. *Holmes v. State, supra*; *Norris v. State, supra* (citing *U.S. v. Gonzalez*, 71 F.3d 819 (11th Cir. 1996)).

*Stone v. State*, 348 Ark. 661, 669, 74 S.W.3d 591, 595-96 (2002). We further observed that the State must prove by clear and positive testimony that the consent to enter and search was unequivocal and specific. *See id.*

■ This court has further held that the "knock-and-talk" procedure is not *per se* violative of the Fourth Amendment to the United States Constitution. *See Scott v. State*, 347 Ark. 767, 67 S.W.3d 567 (2002) (citing *Rogers v. Pendleton*, 249 F.3d 279 (4th Cir. 2001); *United States v. Jones*, 239 F.3d 716 (5th Cir. 2001); *United States v. Johnson*, 170 F.3d 708 (7th Cir. 1999); *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997)). Indeed, the United States Supreme Court in *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), while recognizing that the Fourth Amendment protects the privacy of a home dweller against arbitrary intrusions by police officers, held that the Fourth Amendment did not require knowledge of the right to refuse consent as a prerequisite to a showing of voluntary consent.

■ Despite the federal constitution and federal case law, this court has made it abundantly clear that though the search-and-seizure language of Article 2, § 15, of the Arkansas Constitution is very similar to the words of the Fourth Amendment, we are not bound by the federal interpretation of the Fourth Amendment when interpreting our own law. *See, e.g., Jegley v. Picado*, 349 Ark.

600, 80 S.W.3d 332 (2002); *State v. Sullivan*, 348 Ark. 647, 74 S.W.3d 215 (2002); *Griffin v. State, supra.* Indeed, in *Griffin*, we underscored this point:

> . . . However, we base our analysis of this case upon our own state law as expressed by our state constitution, statutes, and cases, recognizing that while we lack authority to extend the protections of the Fourth Amendment beyond the holdings of the United States Supreme Court, we do have the authority to impose greater restrictions on police activities in our state based upon our own state law than those the Supreme Court holds to be necessary based upon federal constitutional standards. *See Arkansas v. Sullivan*, 532 U.S. 769 (2001).

347 Ark. at 792, 67 S.W.3d at 584.

It is true that in *Stout v. State*, 320 Ark. 552, 898 S.W.2d 457 (1995), which involved the search of a motor vehicle, this court stated that we would interpret Article 2, § 15, in the same manner as the United States Supreme Court interpreted the Fourth Amendment. But the *Stout* case involved the search of a motor vehicle, and we noted in *Stout* that it seemed especially appropriate to follow Fourth Amendment interpretations, because of the difficulty in balancing interests and setting rules for search and seizure of *automobiles*. The case before us concerns the search of a home, which is altogether different and which invokes Arkansas' longstanding and steadfast adherence to the sanctity of the home and protection against unreasonable government intrusions.

Article 2, § 15, of the Arkansas Constitution reads in relevant part:

> The right of the people of this State to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized.

Ark. Const. art. 2, § 15. This provision was adopted as part of the 1874 Arkansas Constitution and is almost identical to the Fourth Amendment. In *Griffin v. State, supra*, we traced the history of this constitutional provision and the reasoning behind it:

> The principle that a man's home is his castle, and that even the King is prohibited from unreasonably intruding upon that home,

was particularly well-developed in the rough-and-ready culture of the frontier, and no less pronounced in the Arkansas Territory. In our 1836 Constitution, the people of our newly admitted state expressed this principle succinctly in the following language:

> § 9. That the people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and that general warrants, whereby any officer may be commanded to search suspected places without evidence of the fact committed, or to seize any person or persons not named whose offenses are not particularly described and supported by evidence, *are dangerous to liberty, and shall not be granted.*

*Id.* (emphasis added).

347 Ark. at 792, 67 S.W.3d at 585. Our 1864 Constitution had the same provision. It was with our 1868 Constitution that the people adopted language substantially identical to the present constitutional provision.

■ This court emphasized the home dweller's right to privacy at nighttime in *Fouse v. State*, 337 Ark. 13, 989 S.W.2d 146 (1999). In *Fouse*, we said: "The privacy of citizens in their homes, secure from nighttime intrusions, is a right of vast importance as attested not only by our Rules [of Criminal Procedure], but also by our state and federal constitutions." 337 Ark. at 23, 989 S.W.2d at 150-51 (quoting *Garner v. State*, 307 Ark. 353, 358-59, 820 S.W.2d 446, 449-50 (1991)).

■ We proceeded in the same vein when we imposed greater protection for persons in their bedrooms against unreasonable government interference in *Jegley v. Picado, supra*, and struck down the state's sodomy statute as unconstitutional when applied to consenting adults in their homes. In *Picado*, we held that the right to privacy implicit in the Arkansas Constitution is a fundamental right which requires a compelling state interest to override it. This rich tradition of protecting the privacy of our citizens in their homes justified our deviating from federal common law in *Picado* with respect to constitutional protection in our homes. Indeed, the legal principle that a person's home is a zone of privacy is as sacrosanct as any right or principle under our state constitution and case law. *See Jegley v. Picado, supra; Griffin v. State, supra.* The same analysis applies to the instant case. Arkansas has clearly

embraced a heightened privacy protection for citizens in their homes against unreasonable searches and seizures, as evidenced by our constitution, state statutes, common law, and criminal rules.

Though it is clear that this court may deviate from federal precedent, the more relevant question is when should we do so? Without question, a slavish following of federal precedent would render this court's opinions merely a mirror image of federal jurisprudence, which would carry with it a certain abrogation of our duty to interpret our own state constitution and follow our own state law. Yet, we admit to a concern about deviating too much from federal precedent based solely on our state constitution. A proper balance must be struck between the two. Justice David Souter, when he served as a justice on the New Hampshire Supreme Court, said it best:

> . . . It is the need of every appellate court for the participation of the bar in the process of trying to think sensibly and comprehensively about the questions that the judicial power has been established to answer. Nowhere is the need greater than in the field of State constitutional law, where we are asked so often to confront questions that have already been decided under the National Constitution. If we place too much reliance on federal precedent we will render the State rules a mere row of shadows; if we place too little, we will render State practice incoherent.

*State v. Bradberry*, 129 N.H. 68, 82-83, 522 A.2d 1380, 1389 (1986) (Souter, J., concurring specially). For a general discussion, *see* Robert L. Brown, *Expanded Rights Through State Law: The United States Supreme Court Shows State Courts The Way*, 4 J. APP. PRAC. & PROCESS 505 (2002).

This state's constitutional history and preexisting state law regarding the privacy rights of a home dweller in his or her home combine to support our decision to discard federal precedent and adopt an interpretation of our state constitution compatible with state law. *See, e.g., State v. Gunwall,* 106 Wash. 2d 54, 720 P.2d 808 (1986). It would be redundant for us to retrace this state's strong history and tradition in favor of protecting privacy in our homes, which has already been expansively set forth in *Jegley v. Picado, supra.* Suffice it to say that this State has adopted and endorsed the principle of privacy in a citizen's home clearly and unmistakably since the time Arkansas was admitted to statehood.

This court is cognizant of what other states have done under their state constitutions in assessing the constitutionality of the

"knock-and-talk" procedure as an alternative to obtaining a search warrant. In *State v. Ferrier,* 136 Wash. 2d 103, 960 P.2d 927 (1998), the Washington Supreme Court analyzed the "knock-and-talk" procedure under the right to privacy as found in the Washington Constitution, as well as under the protection given to its citizens against warrantless searches and seizures. In doing so, that court said: "Especially evident is the fact that [i]n no area is a citizen more entitled to his privacy than in his or her own home. For this reason, the closer officers come to intrusion into a dwelling the greater the constitutional protection." 136 Wash. 2d at 112, 960 P.2d at 931 (internal quotations omitted). The supreme court concluded that preexisting state law amply supported review under the state constitution and that privacy in one's home was "primarily a local concern." *Id.,* 960 P.2d at 931.

The Washington Supreme Court next admitted that when considering voluntary consent under the Fourth Amendment of the United States Constitution, its court of appeals had concluded that it was in lockstep with federal law. But the court emphasized that for the privacy right in one's home, there is a heightened protection for state citizens against unlawful intrusion into the home, and this "places an onerous burden upon the government to show a compelling need to act outside of our warrant requirement." *Id.* at 114, 960 P.2d at 932. The court then held that "knock and talk" was inherently coercive to some degree, but that these coercive effects can "be mitigated by requiring officers who conduct the procedure to warn home dwellers of their right to refuse consent to a warrantless search." *Id.* at 116, 960 P.2d at 933. The court concluded:

> . . . We, therefore, adopt the following rule: that when police officers conduct a knock and talk for the purpose of obtaining consent to search a home, and thereby avoid the necessity of obtaining a warrant, they must, prior to entering the home, inform the person from whom consent is sought that he or she may lawfully refuse to consent to the search and that they can revoke, at any time, the consent that they give, and can limit the scope of the consent to certain areas of the home. The failure to provide these warnings, prior to entering the home, vitiates any consent given thereafter.

*Id.* at 118-19, 960 P.2d at 934. The absence of the required warnings rendered the procedure constitutionally infirm under the Washington Constitution.

In *Graves v. State*, 708 So. 2d 858 (Miss. 1997), the Mississippi Supreme Court held to the same effect. In focusing on whether a knowledgeable waiver occurred in the "knock-and-talk" context, the court held that under the Mississippi Constitution, such a waiver is "defined as consent where the defendant knows that he or she has a right to refuse, being cognizant of his or her rights in the premises." *Graves*, 708 So. 2d at 864. The court remanded the case to the trial court to determine whether a knowledgeable consent had been given.

Early on, the New Jersey Supreme Court held that the United States Supreme Court decision of *Schneckloth v. Bustamonte, supra,* only controlled state court decisions in their construction of the Fourth Amendment. *See State v. Johnson*, 68 N.J. 349, 346 A.2d 66 (1975). For purposes of the search-and-seizure provision of the New Jersey Constitution, *Schneckloth* was not binding, and the state of New Jersey was free to impose a higher standard under state law. The New Jersey Supreme Court did so and interpreted its state constitution to require a home dweller's knowledge of the right to refuse consent as an essential element of any voluntary consent to search.

A fourth appellate court has noted that though the United States Supreme Court has not required it, "the better practice in conducting a knock and talk investigation would be for the officer to identify himself and advise the occupant of his right to deny entry." *Hayes v. State*, 794 N.E.2d 492, 497 (Ind. Ct. App. 2003). The procedure, the court added, would minimize needless suppression motions, hearings, and appeals.

We are convinced that the courts in these states have reached the correct conclusion. As in the case of the State of Washington, our right-to-privacy tradition in Arkansas is "rich and compelling." *Jegley v. Picado*, 349 Ark. at 632, 80 S.W.3d at 349-50. We have held that there is a fundamental right to privacy in our homes implicit in the Arkansas Constitution and that any violation of that fundamental right requires a strict-scrutiny review and a compelling state interest.

■ The dissent cites a raft of cases where this court has adhered to the *Schneckloth v. Bustamonte* standard when interpreting the Fourth Amendment to the United States Constitution. Only one of those cases, *King v. State*, 262 Ark. 342, 557 S.W.2d 386 (1977), adopted the *Bustamonte* standard when interpreting Article 2, § 15, of the Arkansas Constitution with respect to a knowing

consent to search. We now depart from our holding in *King* and overrule that case to the extent it stands for the proposition that a homeowner need not be apprised of his or her right to refuse a consent to search as a prerequisite to a valid consent to search that home.

The United States Supreme Court overrules cases based on the United States Constitution with some regularity. *See, e.g., Crawford v. Washington*, 541 U.S. 36 (March 8, 2004) (interpreting the Confrontation Clause for out-of-court statements of witnesses and overruling *Ohio v. Roberts*, 448 U.S. 56 (1980)); *Lawrence v. Texas*, 123 S. Ct. 2472 (2003) (interpreting the Fourteenth Amendment with regard to homosexuals' rights to liberty and overruling *Bowers v. Hardwick*, 478 U.S. 186 (1986)); *Ring v. Arizona*, 536 U.S. 584 (2002) (interpreting the Sixth Amendment right to a jury trial where trial court, sitting alone, had determined the presence or absence of aggravating circumstances in a death case and overruling *Walton v. Arizona*, 497 U.S. 639 (1990)); *Payne v. Tennessee*, 501 U.S. 808 (1991) (overruling *Booth v. Maryland*, 482 U.S. 496 (1987), and *South Carolina v. Gathers*, 490 U.S. 805 (1989), regarding victim-impact evidence and noting that in the past twenty years, thirty-three of its previous constitutional decisions had been overruled in whole or in part).

 This court has said that although as a general rule we are bound to follow precedent, we will break with precedent when the result is patently wrong and so manifestly unjust that a break becomes unavoidable. *See Aka v. Jefferson Hosp. Ass'n*, 344 Ark. 627, 42 S.W.3d 508 (2001) (citing *State Office of Child Support Enforcement v. Mitchell*, 330 Ark. 338, 954 S.W.2d 907 (1997); *Parish v. Pitts*, 244 Ark. 1239, 429 S.W.2d 215 (1995)). In *Aka*, we held that a viable fetus is a "person" for purposes of the wrongful-death statute and did so based on the express public policy of the General Assembly. In our *Aka* decision, we also alluded to Amendment 68 of the Arkansas Constitution with its declaration that the policy in Arkansas is to protect the life of every unborn child. We have overruled other cases based on an evolving statement of public policy from our General Assembly. *See, e.g., Jackson v. Cadillac Cowboy, Inc.*, 337 Ark. 24, 986 S.W.2d 410 (1999) (striking down *Carr v. Turner*, 238 Ark. 889, 385 S.W.2d 656 (1965), based on high duty of care placed on sellers of alcoholic beverages by General Assembly regarding sales to intoxicated persons); *Shannon v. Wilson*, 329 Ark. 143, 947 S.W.2d 349 (1997) (striking down

dramshop precedent relative to minors based, in part, on General Assembly's enhanced protection of minors). We conclude that Arkansas' strong public policy in favor of privacy in one's home warrants today's opinion and our overruling of *King v. State, supra.*

■ We hold that the failure of the Drug Task Force agents in this case to advise Jaye Brown that she had the right to refuse consent to the search violated her right and the right of Michael Williams against warrantless intrusions into the home, as guaranteed by Article 2, § 15, of the Arkansas Constitution. We affirm the suppression of all evidence seized in this case that flowed from this unconstitutional search. While we do not hold that the Arkansas Constitution requires execution of a written consent form which contains a statement that the home dweller has the right to refuse consent, this undoubtedly would be the better practice for law enforcement to follow.

Affirmed.

DICKEY, C.J., GLAZE and IMBER, JJ., dissent.

TOM GLAZE, Justice, dissenting. Today, a 4–3 divided court issues an opinion that makes a radical change in Arkansas search and seizure law. The decision is clearly contrary to prior law and the change is totally unwarranted and unnecessary. Initially, I point out the obvious mistakes the four-member court has made in its refusal to follow the Fourth Amendment, as it protects all citizens against unlawful searches.

First, the majority's members seem to treat the so-called "knock and talk" as a brand new procedure used by law enforcement officers. Such a procedure has been around for a long time, and merely allows officers to request a home dweller's consent to search his or her dwelling. In this type of situation, the officers have some information that an illegal activity may be occurring inside the home, but the officers do not have sufficient evidence (probable cause) to obtain a search warrant.

Our court has long recognized an officer's right to request a suspect's consent to search the home, under limited circumstances. *See* Ark. Rule Crim. P. 11.1. Rule 11.1 provides as follows: "An officer may conduct searches and make seizures without a search warrant or other color of authority if consent is given to the search or seizure." This court's commentary to Rule 11.1 also makes it clear that an officer seeking consent to search from suspects *does not*

*have to advise them that they may refuse to consent.* (Emphasis added.) The majority opinion completely ignores Rule 11.1, and instead reaches a conclusion which is in clear conflict with the rule.

After the dissenting opinion cited *King v. State,* 262 Ark. 342, 557 S.W.2d 386 (1977), as controlling here, the majority court opted to overrule, rather than follow it. The *King* court considered the very issue now before us: whether Ark. Const. art. 2, § 15 requires that advice of the right to refuse consent be given by law enforcement officers before a consensual search may be found to be voluntary. In *King,* the court held no; here, the majority says yes. In other words, this court simply refuses to follow precedent.

Since the majority opinion fails to even so much as describe the facts or analyze the reasoning in *King,* I will. There, King was convicted of theft, and he contended the trial court erred in denying his motion to suppress evidence secured by a warrantless search. He asserted the search was unreasonable under the federal Fourth Amendment *and* Ark. Const. art. 2, § 15. The trial court ruled that the search was conducted pursuant to a valid consent, and rejected King's argument that a search warrant should have been obtained. Citing *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973), this court upheld the lower court, stating: "[it] is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."

As in the present case, the *King* court dealt with whether the State failed to prove that the consent was voluntarily given because of the coercive nature of the confrontation. The *King* court stated the general rule that the voluntariness of consent is a question of fact to be determined from the totality of the circumstances, and the burden is on the State to prove that consent was voluntarily given by clear and positive proof. *Id.*

Here, the key issue to consider is whether the trial court was correct in ruling that the officers' search could have met constitutional muster *only* if they had informed Jaye M. Brown, Michael C. Williams' co-occupant, that she had the right to refuse consent before any consensual search would be valid under the Arkansas Constitution. This court decided the issue in the *King* decision, which reads as follows:

> Appellant [King] further argues that even if the consent was voluntarily given, the state should be required to prove a knowing and

intelligent waiver and since Mrs. Griggs was not told of her right to refuse consent to the search, the search was invalid. However, a knowing and intelligent consent is not required by our Federal Constitution. In *Schneckloth v. Bustamonte, supra,* the [Supreme] Court said:

> There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment. Nothing either in the purpose behind requiring a 'knowing' and 'intelligent' waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures.

Rather, knowledge of the right to refuse consent is only a factor to be considered in determining the voluntariness of consent and the state is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent. *United States v. Watson,* 423 U.S. 411 (1976); and *Schneckloth v. Bustamonte, supra.* Even so, *appellant [King] urges that since each state has the power to impose higher standards on searches and seizures under its own laws or constitution than are required by our Federal Constitution, we should impose a greater standard than articulated in Schneckloth. In our view the Schneckloth standard of required proof in consent to search is adequate under the terms of our constitution.* Art. 2, § 15, Ark. Const. (1874). Although it appears Mrs. Griggs was not verbally informed of her right to refuse consent, she signed a consent to search her premises and a waiver of her right to be free from unreasonable searches and seizures. She acknowledged that the consent and waiver form was read to her, she understood and signed it.

*King,* 262 Ark. at 346–47 (emphasis added).

As one can readily see, this court in *King* considered the question of whether, under art. 2, § 15, officers must advise a home dweller of his or her right to refuse consent before the officers can legally search the person's home. This court answered the question with a resounding "no," and went into considerable detail as to why a suspect's *knowledge of the right to refuse consent is only a factor* to be considered in determining the voluntariness of a consent. The *King* decision had been good law since 1977, and the majority opinion glibly overrules it, apparently for the reason that case's holding stands in the way of the outcome the majority desires to reach.

Our recent cases, however, remain consistent with *King*. For example, this court has noted that, on the issue of consent searches, we interpret Arkansas law in a manner consistent with federal law. That federal law is followed by a host of Arkansas cases, stating that a person's knowledge of the right to refuse consent to search is *not* a requirement to prove the voluntariness of consent. *See Latta v. State*, 350 Ark. 488, 88 S.W.3d 833 (2002) (court stated that, in most situations where consent is freely and voluntarily given, the "knock and talk" procedure has been upheld as a consensual encounter and a valid means to request consent to search a house); *Scott v. State*, 347 Ark. 767, 57 S.W.3d 567 (2002) (court primarily looked to federal court appellate decisions, noting that *every federal appellate court which has considered the question has concluded that the "knock and talk" or consensual search procedure is not per se violative of the Fourth Amendment*) (emphasis added).[1] This court's holdings in *Latta* and *Scott* merely follow the rationale set forth in *King*. Other states also have recently come to the same conclusion.[2]

Arkansas case law has predictably and repeatedly adhered to the general rule set forth in *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), that "voluntariness of consent" is a question of fact to be determined from *all* the circumstances, and while the subject's knowledge of a *right to refuse consent* is a factor to be taken into account, the prosecution *is not* required to demonstrate such knowledge as *a sole prerequisite to establishing a voluntary consent*. To this effect, *see Latta, supra; Scott, supra; Martin v. State*, 328 Ark. 420, 944 S.W.2d 512 (1997); *Duncan v. State*, 304 Ark. 311, 802 S.W.2d 917 (1991); *Scroggins v. State*, 268 Ark. 261, 595 S.W.2d 219 (1980); *McGuire v. State*, 265 Ark. 621, 580 S.W.2d 198 (1979); *King, supra; Reeves v. State*, 258 Ark. 788, 528 S.W.2d 924 (1975).

---

[1] In support of this statement, the *Scott* court cited the following federal cases: *United States v. Severe*, 29 F.3d 444 (8th Cir. 1994); *Rogers v. Pendleton*, 249 F.3d (4th Cir. 2001); *United States v. Jones*, 239 F.3d 716 (5th Cir. 2001); *United States v. Johnson*, 170 F.3d 708 (7th Cir. 1999); *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997); *United States v. Cormier*, 220 F.3d 1003 (9th Cir. 2000) (the use of the "knock and talk" procedure to gain access to a motel room was permissible, in the absence of reasonable suspicion, and did not result in a seizure of the defendant or violate his consent to search). *See also United States v. Kim*, 27 F.3d 947 (3rd Cir. 1994); *United States v. Tobin*, 923 F.2d 1506 (11th cir. 1991).

[2] For example, the *Scott* court reported the following: Iowa in *State v. Reiner*, 628 N.W.2d 460 (Iowa 2001); Maryland in *Scott v. State*, 366 Md. 121, 782 A.2d 862 (2001); and North Carolina in *State v. Smith*, 346 N.C. 794, 488 S.W.2d 210 (1997). *Scott*, 347 Ark. At 779; *see also State v. Green*, 598 So.2d 624 (La. Ct.App. 1992); *State v. Land*, 106 Or.App. 131, 806 P.2d 1156 (1991).

In light of this court's longstanding adherence to the general rule on consensual searches set out in the foregoing Arkansas and federal cases, the question to be asked is, why has this court precipitously decided to adopt a new rule in Arkansas regarding consensual searches? The majority opinion offers no convincing reason why this court should jettison well-settled Arkansas case law and its own Rule 11.1 on consensual search and seizure. Instead, the majority court, without a compelling reason, substitutes a *new interpretation of Ark. Const. art. 2, § 15,* and now, for the first time, requires a resident to *be advised of his or her right to refuse consent* before a consensual search can be valid.

The majority opinion merely provides that, after today, it will no longer look to the Fourth Amendment to protect Arkansas citizens regarding consensual searches. Instead, the majority claims it wishes to grant greater protection to Arkansas residents by applying the Arkansas Constitution and giving a new interpretation to article 2, § 15, which is the same thread-bare argument put before this court and rejected in the *King* case in 1977. In other words, even if the resident/suspect voluntarily gives a consent to search, the search will be invalid unless the officers says the magic words, "You have the right to refuse to consent to this search."

The majority court offers no evidence that the Fourth Amendment has failed to protect Arkansas residents from illegal searches. Nor does the majority court show that Arkansas law enforcement officers are abusing or misusing searches performed under the Fourth Amendment analysis, which Arkansas courts have recognized and applied over past decades. If there are such abuses by Arkansas law enforcement officers, this court should reveal them.

To my knowledge, our courts have applied the Fourth Amendment analysis in consensual searches, and, while that analysis may not be perfect, the Fourth Amendment mandates that Arkansas courts must consider the totality of the circumstances when officers obtain a subject's consent to enter his or her residence. Requiring an officer to advise the suspect that he or she has a right to refuse consent to a search in no way assures that future questions concerning illegal searches will be abated. For example, our court's review of whether an officer informed the resident that he or she had the right to refuse consent will continue to depend on the credibility of the officer or resident. The threshold question remains: Did the officer give the required admonition (you have the right to refuse to consent) to the resident, and, if the officer did, does the court then consider all other surrounding circumstances that may bear on the validity of the search?

Also, it is more than passing strange that the majority has just now decided to construe Ark. Const. art. 2, § 15 differently, since Arkansas' constitutional provision is virtually identical to the Fourth Amendment.[3] Because article 2, § 15 is almost identical to the language found in the Fourth Amendment, our court in past decisions has justifiably and reasonably adopted the same Fourth Amendment analysis used by the United States Supreme Court and the federal appellate courts when considering search and seizure issues. As a consequence, this court's decisions interpreting art. 2, § 15 have become a part of that constitutional provision. *See Nelson v. Timberline Int'l, Inc.*, 332 Ark. 165, 964 S.W.2d 357 (1998) (*when a constitutional provision or a statute has been construed, and that construction is consistently followed for many years, such construction should not be changed*) (emphasis added); *Morris v. McLemore*, 313 Ark. 53, 852 S.W.2d 135 (1993) (the interpretation given a statute becomes a part of the statute itself). In giving art. 2, § 15 a different interpretation than this court has done in past years, the court, once again, overlooks or ignores its own precedent.

Finally, it is especially noteworthy to mention the case of *Stout v. State*, 320 Ark. 552, 898 S.W.2d 457 (1995). There, this court emphasized the similar wording of art. 2, § 15 and the Fourth Amendment, and specifically held that, in search and seizure conflicts, the court will construe our Constitution in a manner consistent with the Supreme Court's interpretation. The majority attempts to sidestep *Stout* by stating that case involved a motor vehicle and not a residence as in the case now before us. The majority court fails to cite any case law for such an interpretation. In short, the cases cited above in this opinion have construed art. 2, § 15 to cover both motor vehicles and homes.

---

[3] U. S. Const. amend 4 reads as follows:

> Unreasonable searches and seizures. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Ark. Const. Art. 2, § 15 provides the following:

> The right of the people of this State to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized.

The majority opinion cites the case of *Jegley v. Picado*, 349 Ark. 600, 80 S.W.3d 332 (2000), for the legal principle that a person's home is a zone of privacy and it is as sacrosanct as any right or principle under our state constitution and case law. It also cites *Griffin v. State*, 347 Ark. 788, 67 S.W.3d 582 (2002); *Griffin*, however, was not a "knock and talk" consensual search case and is clearly not relevant here. The *Jegley* case, too, is inapposite. In brief terms, *Jegley* was a civil case that challenged the Arkansas sodomy statute, Ark. Code Ann. § 5-14-122 (Repl. 1997), which this court held unconstitutional as a matter of law. While this court in *Jegley* discussed Arkansas citizens' right of privacy, such a right is also recognized by the Constitution of the United States. Our courts have held that such intrusions are presumptively unreasonable under the Fourth Amendment. Clearly, this country's Fourth Amendment was adopted to protect citizens from warrantless entry into a private home, and, in order to protect citizens against such warrantless intrusions to do so is presumptively unreasonable under the Fourth Amendment. The State has the burden to prove a warrantless entry into a home is reasonable. Under *Scott, supra*, when a warrantless entry into the home is made with consent, the entry does not violate the Fourth Amendment. *Id.*

Finally, with respect to the majority's overruling of *King*, it is important to note that the majority relies on cases wherein this court "overruled other cases based on an evolving statement of *public policy from our General Assembly*." Of course, this court has held repeatedly that the determination of this state's public policy "lies almost exclusively in the legislative domain." *See Bonds v. Carter*, 348 Ark. 591, 75 S.W.3d 192 (2002); *Jordan v. Atlantic Cas. Ins.*, 344 Ark. 81, 40 S.W.3d 254 (2001); *State v. Lester*, 343 Ark. 662, 75 S.W.3d 192 (2002). Indeed, in *Miller v. State*, 338 Ark. 445, 994 S.W.2d 476 (1999), this court stated that "the public policy of the State of Arkansas is declared by the General Assembly, not its courts." Here, however, the majority takes it upon itself to declare, essentially, by judicial fiat, that it knows better than the General Assembly what our public policy should be.

In conclusion, because the trial court (with the majority's aid) has misinterpreted and misapplied Arkansas' consent-to-search law, I would reverse and remand this case for the trial court to consider the voluntariness of Brown's consent from the totality of the circumstances.

DICKEY, C.J., and IMBER, J., join this dissent.